1

**GUTRIDE SAFIER LLP**

2

Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com

3

Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com

4

Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com

5

100 Pine Street, Suite 1250
San Francisco, CA 94111

6

Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

7

*Attorneys for Plaintiff*

8

## UNITED STATES DISTRICT COURT

9

## NORTHERN DISTRICT OF CALIFORNIA

10

SAL MUNOZ, an individual, on behalf of himself, the general public, and those similarly situated,

11

12

Plaintiff,

13

v.

14

PEET'S COFFEE, INC.,

15

Defendant.

CASE NO.

**CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; AND UNJUST ENRICHMENT**

JURY TRIAL DEMANDED

16

17

18

19

20

21

22

23

24

25

26

27

28

---

CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

THE PARTIES .....................................................................................................................2

JURISDICTION AND VENUE .............................................................................................3

SUBSTANTIVE ALLEGATIONS ........................................................................................3

    A.    Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies..........................................................3

    B.    Defendant Falsely Informed Users That They Could Decline or Reject the Website's Use of Cookies. .........................................................................................8

    C.    The Private Communications Intercepted and Collected Through Third Party Cookies on Defendant's Website. ........................................................................17

        1.    The Website Causes the Interception of the Contents of Communications ...................................................................................17

        2.    Facebook Cookies ......................................................................................18

        3.    Google Cookies ..........................................................................................22

        4.    TikTok Cookies ..........................................................................................29

        5.    Microsoft Clarity Cookies ........................................................................37

        6.    Additional Third-Party Cookies ..............................................................39

    D.    The Private Communications Collected are Valuable..........................................41

PLAINTIFF'S EXPERIENCES .............................................................................................43

CLASS ALLEGATIONS .......................................................................................................46

CAUSES OF ACTION...........................................................................................................48

    First Cause of Action: Invasion of Privacy ........................................................48

    Second Cause of Action: Intrusion Upon Seclusion ..........................................50

    Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631) ...........................................................52

    Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51).................................57

    Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation .............59

    Sixth Cause of Action: Unjust Enrichment ........................................................61

PRAYER FOR RELIEF .........................................................................................................62

CLASS ACTION COMPLAINT

Plaintiff Sal Munoz ("Plaintiff") brings this action on behalf of himself, the general public, and all others similarly situated against Peet's Coffee, Inc. ("Defendant" or "Peet's"). Plaintiff's allegations against Defendant are based on information and belief and the investigation of Plaintiff's counsel, except for allegations specifically pertaining to Plaintiff, which are based on his personal knowledge.

## INTRODUCTION

1.      This Class Action Complaint concerns egregious violations of consumer privacy and breach of consumer trust in violation of California law. When consumers visit Defendant's ecommerce website (www.peets.com, the "Website"), Defendant displays to them a popup cookie consent banner. Defendant's cookie banner discloses that the Website uses cookies but expressly gives users the option to control how they are tracked and how their personal data is used by providing the option to click or select a "Preferences" button, as shown in the following screenshot, which has been stretched for readability:



This website uses various technologies including cookies for personalization, website usage and performance measurement, and targeted advertising. Information about your site visit may be stored by or shared with third parties as identified in our Privacy Policy.    **Preferences**    **Accept**

2.      Like most internet websites, Defendant designed the Website to include resources and programming scripts from third parties that cause those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. Unlike many websites, however, Defendant affirmatively represented that users could browse the Website without being tracked, followed, or targeted by third-party data brokers and advertisers. Those representations were false.

3.      Even after users elect to decline or reject all categories of cookies, including Analytics and Statistics, Marketing and Retargeting, and Functionality cookies, other than those "Strictly Required Cookies" which Defendant represented were "required for the website to run and cannot be switched off[,]" Defendant nonetheless caused multiple third parties—including Meta Platforms, Inc. (Facebook), Google LLC (Google Analytics), ByteDance Ltd. (TikTok), Microsoft Corporation (Microsoft Clarity), LinkedIn Corporation (a subsidiary of Microsoft

Corp.), Pinterest, Inc. (Pinterest), and X Corp. (Twitter) (the "Third Parties")—to place and/or transmit cookies that track users' website browsing activities and intercepted their private communications on the Website.

4.      Contrary to users' express rejection of cookies and tracking technologies, Defendant caused cookies, including the Third Parties' cookies, to be sent to Plaintiff and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These cookies permitted the Third Parties to track and collect data in real time regarding Website visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

5.      The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

6.      This type of tracking and data sharing is exactly what Website visitors sought to avoid when they adjusted their cookie settings to decline or reject cookies. Defendant falsely told Website users that it respected their privacy choices and would refrain from tracking and data sharing when uses rejected cookies. Despite receiving clear notice of users' lack of consent, Defendant ignored those choices and violated state statutes and tort duties owed to Plaintiff and those similarly situated Website users.

**THE PARTIES**

7.      Plaintiff Sal Munoz is, and was at all relevant times, an individual and resident of Hayward, California. Plaintiff intends to remain in California and makes his permanent home there.

8.      Defendant Peet's Coffee, Inc. is a Virginia corporation with its headquarters and principal place of business in Emeryville, California.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiff and Defendant are citizens of different states.

10.     The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

11.     Further, the Private Communications and data that Defendant causes to be transmitted to Third Parties are routed through servers located in California.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

13.     Plaintiff accordingly alleges that jurisdiction and venue are proper in this Court.

## SUBSTANTIVE ALLEGATIONS

**A.      Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies.**

14.     Every website, including the Website, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to and from Internet users' browsers. For example, when a user clicks on a hyperlink on the Website, the user's browser sends a "GET" request to the Website's server. The GET request tells the Website server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website server receives an HTTP request, it

processes that request and sends back an HTTP response. The HTTP request includes the client's IP address, which allows the Website server to identify the origin of the request and return the response.

15.     An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

16.     As a result, Defendant knew or should have known that the devices used by Plaintiff and Class members to access the Website were located in California.

17.     Defendant voluntarily integrated "third-party resources" from the Third Parties into its Website programming. "Third-party resources" refer to tools, content or services provided by third parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendant's use of the third-party resources on the Website is done so pursuant to agreements between Defendant and those Third Parties.

18.     The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

19.     First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Website's server). First-party cookies are used to track users when they repeatedly visit the same website.

CLASS ACTION COMPLAINT

20.     A third-party cookie is set by a third-party domain/webserver (e.g., www.facebook.com; analytics.google.com; analytics.tiktok.com; clarity.ms; etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

21.     As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Website are transmitted to those third parties, enabling them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendant, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;

- **Visit History**: Information about the frequency and total number of visits to the Website;

- **Website Interactions:** Data on which links, buttons, or ads on the Website that a user clicks;

- **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;

- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website content;

- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;

CLASS ACTION COMPLAINT

- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;

- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;

- **Referring URL**: Information about the website that referred the user to the Website;

- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;

- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or

- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible, including whether the user is located in California.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

22. Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to enhance website performance and generate revenue through data collection and targeted advertising.

23. Defendant operates a chain of coffee shops that sell brewed coffee and tea drinks, as well as roasted coffee beans and related packaged products. Defendant owns and operates the Website, which allows visitors to receive information about its products and purchase products.

CLASS ACTION COMPLAINT

As they interact with the Website (e.g., by entering data into forms, clicking on links, and making selections), Website users communicate Private Communications to Defendant, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

24.    Defendant chose to install or integrate its Website with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its Website, or that Defendant causes to be loaded. Because Defendant controls the Website's software code, and is capable of determining whether a user is accessing the Website from California, it has complete control over whether first-party and third-party cookies are placed on its California users' devices and/or transmitted to third parties.

25.    Defendant explained the third-party cookies it used on the Website as follows in its Privacy Policy:

> *Cookies*. A cookie is a file saved to your computer or device that may be used to recognize our users when they return to our Sites, provide shopping cart reminders, collect usage information, remember user's preferences, and provide customized versions of our Sites. We use this information to evaluate our web traffic, enhance our communications, understand the effectiveness of our ad or promotional campaigns, and improve our website and services, including providing you with interest-based ads. For more information on our advertising, see below: "Interest-Based Advertising."
>
> …
>
> We use Google Analytics including Google Signals, which allows Google to collect session data from our Sites and associate the data with certain users who have signed in to their Google accounts. Google Analytics helps us understand how users engage with our Sites and enable advertising.
>
> …
>
> *Interest-Based Advertising*. We provide interest-based advertising about our products and services on other parties' websites. We may use third-party advertising companies that use tracking technologies to serve our advertisements across the Internet. These companies may collect information about your visits to the Sites and other websites and your interaction with our advertising and other

communications. These advertising companies serve ads on behalf of us and others on non-affiliated sites, and some of those ads may be personalized, meaning that they are intended to be relevant to you based on information collected about your visits to the Sites and elsewhere over time. Other companies may also use such technology to advertise on our Sites. You have the choice to tell us not to collect and use this information, and in some jurisdictions, we will only engage in interest-based advertising if you opt-in.

…

Peet's may develop content and advertising based on the analytics and user information developed from cookies or similar technology.[1]

### B.    Defendant Falsely Informed Users That They Could Decline or Reject the Website's Use of Cookies.

26.    When Plaintiff and other consumers in California visited the Website, the Website immediately displayed to them a popup cookie consent banner. As shown in the screenshot below, the cookie consent banner stated, in relevant part, "This website uses various technologies including cookies for personalization, website usage and performance measurement, and targeted advertising. Information about your site visit may be stored by or shared with third parties as identified in our Privacy Policy[.]" The banner then purported to provide users the opportunity to either "Accept" such cookies or otherwise adjust or manage cookie "Preferences" as shown in the following screenshot from the Website (stretched to enhance readability):



27.    Plaintiff and other Website users who clicked or selected the "Preferences" button were then directed to Defendant's cookie preferences window where Defendant expressly represented to its users that they could "Choose Type of Cookies You Accept." The types of cookies users could choose to not accept, or to otherwise decline or reject, included (i) "Analytics and Statistics" cookies, which "measure visitors [sic] traffic and see traffic sources"; (ii)

---

[1] Peet's Coffee, Inc. Privacy Policy (effective 3/25/2024) (formerly available at https://www.peets.com/pages/privacy-policy) (the "Privacy Policy"). On information and belief, Defendant updated and modified its Privacy Policy on July 25, 2025, which it now refers to as its "Privacy Notice."

CLASS ACTION COMPLAINT

"Marketing and Retargeting" cookies, which are "set by our marketing and advertising partners…to build a profile of your interest [sic] and later show you relevant ads"; and, (iii) "Functionality" cookies, which enable "personal settings" and "can be set by us or by third-party service providers[.]" Users could apparently decline or reject these cookies by adjusting the setting next to each of the above categories of cookies (i.e. by unchecking or de-selecting each check box). The only cookies users could not decline or reject were the "Strictly Required Cookies" that are "required for the website to run and cannot be switched off." All of this was as shown in the following screenshot from the Website:



28.    Users who adjusted the settings in the cookie preferences window associated with Analytics and Statistics, Marketing and Retargeting, and Functionality cookies, thereby

CLASS ACTION COMPLAINT

indicating their choice and/or agreement to decline or reject all cookies and tracking technologies in use on the Website, except those "Strictly Required" for the Website to function, could then continue to browse the Website, as both the popup cookie consent banner and cookie preferences window disappeared after users also clicked or selected the "Accept selected" button.

29.     Defendant's popup cookie consent banner and Cookie preferences window led Plaintiff, and all those Website users similarly situated, to believe that they declined or rejected all cookies and tracking technologies, especially those used to measure visitor traffic, build a profile of user interests to show them advertising, and enable personal settings. The banner further reasonably led Plaintiff and those Website users similarly situated to believe that Defendant would not allow third parties, through cookies, to access their Private Communications with the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon adjusting settings in the cookie preferences window to decline or reject all categories of cookies, including all Analytics and Statistics, Marketing and Retargeting, and Functionality cookies, except "Strictly Required" cookies

30.     Defendant's representations, however, were false. In truth, Defendant did not abide by Plaintiff's or other users' wishes. When Plaintiff and other Website users adjusted settings in the cookie preferences window to decline or reject all categories of cookies, except "Strictly Required" cookies, they provided notice to Defendant that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Website.

31.     Nevertheless, even after receiving that notice, Defendant caused the Third Parties' cookies to be placed on Website users' browsers and devices and/or transmitted to the Third Parties along with user data. In particular, when users adjusted settings in the Cookie preferences window to decline or reject all cookies, including all Analytics and Statistics, Marketing and Retargeting, and Functionality cookies, except "Strictly Required" cookies, Defendant nonetheless continued to cause the Third Parties' cookies to be placed on users'

devices and/or transmitted to the Third Parties along with user data, enabling them to collect user data in real time that discloses Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiff tried to protect their privacy by declining or rejecting cookies, Defendant failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

32.    Some aspects of the operations of the Third Parties' cookies on the Website can be observed using specialized tools that log incoming and outgoing Website network transmissions. The following screenshots, obtained using one such tool, show examples of Third-Party cookies being transmitted from a Website user's device and browser to Third Parties even after the user adjusted settings in the cookie preferences window to decline or reject all categories of cookies, including all Analytics and Statistics, Marketing and Retargeting, and Functionality cookies, except "Strictly Required" cookies:

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15            (image above enlarged to enhance readability)
16
17
18
19
20
21
22
23
24
25
26
27
28

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13



14

15

16

17

18

19 **[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

(image above enlarged to enhance readability)



33.     The screenshots above show the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third-party websites while the user visited and interacted with Defendant's Website at https://www.peets.com. The screenshots depict only network traffic occurring **after** the user declined or rejected all cookies in the cookie preferences window. As shown above, despite the user's declination or rejection of all such cookies, the user's interactions with the Website resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains like www.facebook.com; analytics.google.com; analytics.tiktok.com; clarity.ms, and others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that Defendant caused third-party cookie data and users' Private Communications

CLASS ACTION COMPLAINT

to be transmitted to Third Parties, even after consumers declined or rejected all such cookies and tracking technologies in the cookie preferences window. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's declination or rejection of all non-required cookies.

34.    Plaintiff's and other Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

35.    As users interact with the Website, even after declining or rejecting the use of non-required cookies and similar technologies for traffic analytics, targeted advertising, and personalized content, as well as the sale or sharing of the user's personal information with third parties for such functions, or other purposes, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data. The third-party cookies that Defendant wrongfully allows to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Website. Because third-party cookies cause the Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

36.    The Third Party code that the Website causes to be loaded and executed by the user's browser constitutes a wiretap because, when it is executed, it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop

upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on Website users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

**C.      The Private Communications Intercepted and Collected Through Third Party Cookies on Defendant's Website.[2]**

> **1.      The Website Causes the Interception of the Contents of Communications**

37.     The Website includes a search bar and other input fields which users enter information. For example, below is a screenshot of the search bar on the Website where users can type into the search bar to cause the Website to search its contents.



38.     When users input the information into the search bar, they intend to communicate the contents of their search directly to the Website.

39.     Instead, Defendant programmed the Website so that the contents of those communications are intercepted by the Third Parties while the communications are in transit between the user's browser and the Website.

40.     For example, the Website causes consumers' search strings to be transmitted to Google—even after consumers have rejected all non-strictly necessary cookies. In the example below, the test string "tea" was sent to Google along with cookie data:

_____

[2] This section contains multiple examples of specific data being sent from a user's browser to third parties. Each example was collected after the user had rejected all non-strictly required cookies using the Website.

CLASS ACTION COMPLAINT

(the red arrow has been added by Plaintiff's counsel and points to the shared search string)

### 2. Facebook Cookies

41.     Defendant causes third party cookies to be transmitted to and from Website users' browsers and devices to and from the **facebook.com** domain, even after users elect to decline or reject all non-strictly required cookies. This domain is associated with Meta's digital advertising and analytics platform that collects user information via cookies to assist Meta in performing data collection, behavioral analysis, user retargeting, and analytics.[3] Meta serves targeted ads to web users across Meta's ad network, which spans millions of websites and apps.

42.     Cookies help Meta track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. For example, when a user clicks a button on the Website, Defendant causes the following data to be transmitted to Meta:

---

[3] https://www.facebook.com/privacy/policies/cookies/.

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT



| | |
|---|---|
| ud[external_id] | 3877b196d80641dbbd65471c330c2902cc28c247 eacf5feb3214469508975db4 |
| v | 2.9.157 |

43.    The "ev" parameter denotes an "Event." In this case, the event is a "SubscribedButtonClick," indicating to Facebook that the user has clicked a specific button on the Website. The "cd[buttonText]" parameter discloses to Facebook the exact text of the button the user clicked. In this case, the text is "SHOP NOW."

44.    The "dl" parameter is the "Document Location." It tells Facebook the specific webpage on which the Event occurred – in this case, https://www.peets.com/

45.    The "ts" parameter corresponds to a "Timestamp," and tells Facebook the exact time—down to the millisecond—at which the user viewed the page.

46.    The "fbp" parameter is the Facebook Browser ID, and is used to track the user's activity across the Internet.

47.    The "sw" and "sh" parameters stand for "screen width" and "screen height," and correspond to the display the user was viewing when the event was recorded.

48.    Cookies are sent along with all data transmissions to Meta. For instance, the following cookies were sent along with the data above:

| Key | Value |
|---|---|
| sb | Zjs5ZteaLaMAoSnEvL-wZcDU |
| datr | Zjs5ZlAp-NEFNgr_0oWoapa9 |
| c_user | 1178880062 |
| ps_n | 1 |
| xs | 15%3AlwTO3Ou5jdN0Yw%3A2%3A1718218885%3A-1%3A2579%3A%3AAcX_d9bKh3s8skoVmoXrtRvnBJl7NSzFAW37cZ2Oag |
| fr | 1wdC7jKKrMtldNpxP.AWUA8_SU9NkfE_oMB4CVTdjBO8s.Bmaf7L..AAA.0.0.Bmaf7L.AWVpW0wufGY |

49.     The "c_user" cookie shown above causes Facebook to identify a specific user when they are logged in to their account. The "c_user" cookie stores a user's unique ID, which is associated with their Facebook profile. This ID causes Facebook to track user interactions on its platform and across sites that use Facebook plugins, such as adding items to a cart, clicking "Like" buttons, or engaging with comment sections. When combined with other data sent to the Facebook domain, this cookie allows Meta to track users' browsing activities. Facebook uses this data for various purposes, such as personalizing content, enhancing ad targeting accuracy, and refining its user experience.

50.     In particular, by identifying users who have shown interest in certain products or content, the facebook.com cookies cause Meta's advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Meta's ad network.[4] These cookies allow Meta to collect data on how users interact with websites, regardless of whether the user has a Facebook account or is logged in.[5]

51.     The facebook.com cookies allow Meta to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses)—including whether a user is located in California.[6]

52.     Meta utilizes the data collected through the facebook.com cookies for its own purposes, including by using the data to tailor content and target advertisements to users. This includes practices such as (i) **Ad Targeting and Retargeting**, in which Meta uses the facebook.com cookie to track users' online behavior across different sites, building a profile based on their browsing habits, purchases, and interactions. This profile enables Facebook to deliver highly targeted ads within the Facebook ecosystem and on other sites that are part of Facebook's Audience Network; (ii) **Conversion Tracking**, in which Meta uses the facebook.com cookie to enable business partners to track specific actions users take after

---

[4] *Id.*; https://allaboutcookies.org/what-data-does-facebook-collect.
[5] https://allaboutcookies.org/what-data-does-facebook-collect.
[6] *Id.*

viewing or clicking on a Facebook ad, such as making a purchase or signing up for a newsletter; (iii) **Audience Insights and Analytics**, in which Meta uses the facebook.com cookie to provide data to businesses on user demographics, interests, and behaviors across their sites and apps; and (iv) **Cross-Device and Cross-Platform Tracking**, in which Meta uses the facebook.com cookie to support tracking users across devices and platforms, so that ads are targeted consistently regardless of the device a user is on. This ensures that advertisers can follow users across devices.

53.    In addition, the Website causes the user's "user-agent" information to be sent to Meta:

user-agent              Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7)
                        AppleWebKit/537.36 (KHTML, like Gecko) Chrome/
                        125.0.0.0 Safari/537.36

54.    The user-agent corresponds to the device and browser that the user has used to access the Website.

55.    Finally, the data sent to Meta includes the user's IP address.

### 3.    Google Cookies

56.    Defendant causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users rejected all non-strictly required cookies, to and from the **www.google.com** and **analytics.google.com** domains. Each of these domains is associated with Google LLC's digital advertising and analytics platform that collects user information via cookies to assist Google in performing data collection, behavioral analysis, user retargeting, and analytics.[7] Google serves targeted ads to web users across Google's ad network, which spans millions of websites and apps. Nearly 20% of web traffic is tracked by Google's DoubleClick cookies.[8] Google's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have shown interest in certain products or content, Google's cookies cause its advertising platform to

---

[7] *See* Our advertising and measurement cookies (available at
https://business.safety.google/adscookies/).
[8] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.

enable advertisers to show relevant ads to those users when they visit other websites within Google's ad network.[9]

57.     Specifically, Google sends cookies when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[10] "Pages with Google Marketing Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include Google Marketing Platform advertising products or Google Ad Manager ad tags, which might load a click tracker or impression pixel instead." *Id.* As Google explains, "Google Marketing Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers." *Id.*

58.     Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[11] "To measure a website … [one] add[s] a small piece of JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a webpage, the tracking code will collect … information about how that user interacted with the page." *Id.* Google Analytics enables website owners to "measure when someone loads a page, clicks a link, [ ] makes a purchase;" "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; and "views their shopping cart."[12]

---

[9] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=1196213575075458908-NC).

[10] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=1196213575075458908-NC); *see also* Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).

[11] How Google Analytics Works (available at https://support.google.com/analytics/answer/12159447?hl=en).

**[12] Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://developers.google.com/analytics/devguides/collection/ga4/events**).

- 23 -

59.     Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data—including whether a user is located in California.[13]

60.     For example, the Google software code that Defendant causes to be stored on and executed by the Website user's device causes the following data to be sent to Google's domain, at analytics.google.com:



---

[13] *See* About the Google Tag (available at
https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at
https://support.google.com/searchads/answer/7298581?hl=en&sjid=1196213575075458908-NC&visit_id=6386706756695576522-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735).

- 24 -
CLASS ACTION COMPLAINT

| | |
|------|------|
| frm | 0 |
| gcd | 13I3I3I3I1 |
| gtm | 45je46a0v868588375z8866311365za200zb8663 11365 |
| npa | 0 |
| pae | 1 |
| pr1 | id1000383~k0item_variant_id~v039537255514156~k1item_product_id~v16618994147372~nmPanama Don Bosco~ln~li~brPeet's Coffee~caCoffee~vaWhole Bean~pr21.95 |
| pscdl | noapi |
| sct | 2 |
| seg | 1 |
| sid | 1718227613 |
| sr | 1440x900 |
| tag_exp | 0 |
| tfd | 6446 |
| tid | G-G2C1TEYFVL |
| uaa | arm |
| uab | 64 |
| uafvl | Google%20Chrome;125.0.6422.142\| Chromium;125.0.6422.142\| Not.A%2FBrand;24.0.0.0 |
| uam | |
| uamb | 0 |
| uap | macOS |
| uapv | 13.5.1 |
| uaw | 0 |
| uid | 9318844d-2a93-4f7e-8342-def28dfe999f |
| ul | en-us |
| v | 2 |

61.     The "npa" parameter refers to "Non-Personalized Ads." When npa is set to 1, it indicates the non-personalized ads preference is enabled. Here, npa is set to 0, indicating that standard (personalized) ads are enabled.

62.     The "dl" parameter tells Google what webpage the user was viewing on the Website, and the "dt" parameter contains the title of that page.

63.     The "pr1" parameter tells Google the specific product the user was viewing.

CLASS ACTION COMPLAINT

64. The parameters beginning in "ua…" tell Google extensive information about the user's device and browser, including the specific operating system, browser brand, and device processor.

65. Similar data is sent to https://www.google.com/ads:



66. The "cid" parameter above refers to "Client ID." It contains a unique identifier for the user's browser and device, that allows Google to link the user to their interactions with the Eebsite.[14]

67. Along with this data, the Google software code that Defendant causes to be stored on and executed by the user's device causes the following cookies to be sent to Google's analytics domain:

---

[14] *See, e.g.*, https://cheatography.com/dmpg-tom/cheat-sheets/google-universal-analytics-url-collect-parameters/; https://www.analyticsmarket.com/blog/how-google-analytics-collects-data/; https://www.owox.com/blog/use-cases-google-analytics-client-id/.

68. The "NID" cookie is also used for Google advertising. Specifically, it is used to show Google ads to users.[15]

69. The __Secure-3PAPISID and __Secure-3PSID cookies used on the Website are utilized by Google to build a profile of Website visitor interests to show relevant and personalized ads through retargeting.

70. Similar cookie data is also sent to https://www.google.com/ads:

---

[15] *See* https://policies.google.com/technologies/cookies?hl=en-US.

CLASS ACTION COMPLAINT

71.     Further, along with all of this data, the Google software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" and IP address information to be sent to Google.

72.     Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie causes Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience segments based on shared traits (such as females, Millennials, Californians, etc.), and to perform targeted advertising and marketing analytics.

73.     Thus, the Google cookies used on the Website cause Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected through the cookie enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits

CLASS ACTION COMPLAINT

travel-related websites, Google will show her more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as renaming their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build leads and sales by bringing previous visitors back to your website to complete what they started."[16]

74.    Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[17] Thus, Google has the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

### 4.    TikTok Cookies

75.    Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users have rejected all non-required cookies, to and from the **analytics.tiktok.com** domain. This domain is associated with TikTok for Business, a suite of tools offered by TikTok, a social media platform owned by ByteDance Ltd., known for short-form video sharing. The TikTok platform is used to create and share videos, and it utilizes

---

[16] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).

[17] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).

cookies for various purposes including assisting brands and marketers to create, manage, and optimize ad campaigns on the platform.[18]

76.    TikTok utilizes cookies to collect data on user interactions with websites that have integrated TikTok's tracking technologies (such as the Website). These cookies are used to "measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[19] TikTok further explains that it uses cookies to "match events with people who engage with your content on TikTok. Matched events are used to improve measurement and optimize ad campaigns. They can also contribute to building your retargeting and engagement audiences." *Id.* These cookies cause TikTok to recognize and track users across different sessions and domains (i.e., cross-site tracking) and to collect and synchronize user data across sessions and domains to observe and evaluate TikTok user behavior.

77.    These cookies cause TikTok to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, including *email addresses and phone numbers*; (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) session information, (x) user identifiers, and (xi) geolocation data in the form of the IP address—including whether a user is located in California.[20]

78.    For example, the TikTok software code that Defendant causes to be stored on and executed by the Website user's device causes the following data to be sent to TikTok's domain:

---

[18] *See, e.g.*, TikTok for Business (https://ads.tiktok.com/business/en-US/products/ads; and https://ads.tiktok.com/business/en-US/products/measurement); TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).
[19] TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).
[20] *Id.*; *see also* TikTok for Business: Enhance Data Postback with the TikTok Pixel (https://ads.tiktok.com/help/article/enhance-data-postback-with-the-tiktok-pixel?lang=en); TikTok for Business: Advanced Matching for Web (available at https://ads.tiktok.com/help/article/advanced-matching-web?redirected=1); TikTok for Business: About TikTok Pixel (available at https://ads.tiktok.com/help/article/tiktok-pixel?lang=en).

POST   200   https://analytics.tiktok.com/api/v2,

Request  Header  Query  Body  Cookies  Raw  Summary  +  PLAIN ⇕  ⊕

```
1 ∨ {
2       "_inspection": {},
3       "action": "Metadata",
4 ∨     "auto_collected_properties": {
5 ∨       "content_data": {
6             "json_ld": "[{\"@context\":\"https://schema.
              org\",\"@id\":\"https://www.peets.com/products/
              panama-don-bosco\",\"@type\":\"Product\",
              \"sku\":\"1000383\",\"mpn\":\"1000383\",
              \"brand\":{\"@type\":\"Brand\",
              \"name\":\"Peet's Coffee\"},
              \"description\":\"Sourced directly from a
              family farm on the border of Panama and Costa
              Rica, this is the best expression of a high
              grown Central American coffee: sweet, elegant,
              and as pristine as the rainforest that
              surrounds the farm. \\nLast order date: June
              27\",\"url\":\"https://www.peets.com/products/
              panama-don-bosco\",\"name\":\"Panama Don
              Bosco\",\"image\":\"https://www.peets.com/cdn/
              shop/files/
              24DTC-June-LTO-Panama-Don-BoscoPDP-Bag-Asset1266
              x1492.png?v=1716570106\",\"offers\":
              [{\"@type\":\"Offer\",
              \"availability\":\"https://schema.org/InStock\",
              \"priceCurrency\":\"USD\",\"price\":\"21.95\",
              \"priceValidUntil\":\"2025-06-12\",
```

CLASS ACTION COMPLAINT

\"itemCondition\":\"https://schema.org/
NewCondition\",\"url\":\"https://www.peets.com/
products/panama-don-bosco/products/
panama-don-bosco?variant=39537255514156\",
\"image\":\"https://www.peets.com/cdn/shop/
files/
24DTC-June-LTO-Panama-Don-BoscoPDP-Bag-Asset1266
x1492.png?v=1716570106\",\"mpn\":\"1000383\",
\"sku\":\"1000383\",\"seller\":
{\"@type\":\"Organization\",\"name\":\"Peet&#39;
s Coffee\"}},{\"@type\":\"Offer\",
\"availability\":\"https://schema.org/InStock\",
\"priceCurrency\":\"USD\",\"price\":\"21.95\",
\"priceValidUntil\":\"2025-06-12\",
\"itemCondition\":\"https://schema.org/
NewCondition\",\"url\":\"https://www.peets.com/
products/panama-don-bosco/products/
panama-don-bosco?variant=39537255546924\",
\"image\":\"https://www.peets.com/cdn/shop/
files/
24DTC-June-LTO-Panama-Don-BoscoPDP-Bag-Asset1266
x1492.png?v=1716570106\",\"mpn\":\"1000384\",
\"sku\":\"1000384\",\"seller\":
{\"@type\":\"Organization\",\"name\":\"Peet&#39;
s Coffee\"}},{\"@type\":\"Offer\",

\"availability\":\"https://schema.org/InStock\",
\"priceCurrency\":\"USD\",\"price\":\"21.95\",
\"priceValidUntil\":\"2025-06-12\",
\"itemCondition\":\"https://schema.org/
NewCondition\",\"url\":\"https://www.peets.com/
products/panama-don-bosco/products/
panama-don-bosco?variant=39537255579692\",
\"image\":\"https://www.peets.com/cdn/shop/
files/
24DTC-June-LTO-Panama-Don-BoscoPDP-Bag-Asset1266
x1492.png?v=1716570106\",\"mpn\":\"1000385\",
\"sku\":\"1000385\",\"seller\":
{\"@type\":\"Organization\",\"name\":\"Peet&#39;
s Coffee\"}},{\"@type\":\"Offer\",
\"availability\":\"https://schema.org/InStock\",
\"priceCurrency\":\"USD\",\"price\":\"21.95\",
\"priceValidUntil\":\"2025-06-12\",
\"itemCondition\":\"https://schema.org/
NewCondition\",\"url\":\"https://www.peets.com/
products/panama-don-bosco/products/
panama-don-bosco?variant=4120875565060 4\",
\"image\":\"https://www.peets.com/cdn/shop/
files/
24DTC-June-LTO-Panama-Don-BoscoPDP-Bag-Asset1266
x1492.png?v=1716570106\",\"mpn\":\"1000386\",
\"sku\":\"1000386\",\"seller\":

CLASS ACTION COMPLAINT

7
{\"@type\":\"Organization\",\"name\":\"Peet&#39;
s Coffee\"}}]}]",
"meta": "{\"title\":\"Peet's Panama Don Bosco
Dark Roast Coffee | Limited Release | Peet's
Coffee\",\"meta:description\":\"Sourced
directly from a family farm on the border of
Panama and Costa Rica, this is the best
expression of a high grown Central American
coffee: sweet, elegant, and as pristine as the
rainforest that surrounds the farm. Subscribers
always get free shipping and up to 10% off all
orders!\"}",
8
"microdata": "[]",
9
"open_graph": "{\"og:image\":\"https://cdn.
shopify.com/s/files/1/0319/0764/3436/files/
24DTC-June-LTO-Panama-Don-BoscoPDP-Bag-Asset1266
x1492.png?v=1716570106\",
\"og:image:secure_url\":\"https://cdn.shopify.
com/s/files/1/0319/0764/3436/files/
24DTC-June-LTO-Panama-Don-BoscoPDP-Bag-Asset1266
x1492.png?v=1716570106\",
\"og:image:width\":\"1266\",
\"og:image:height\":\"1492\",
\"og:image:alt\":\"Peet's Coffee Panama Don
Bosco coffee beans in a Silver 16 oz bag\"}"
10
},

CLASS ACTION COMPLAINT

```
11       "page_trigger": "PageView"
12     },
13  ∨  "context": {
14  ∨    "ad": {
15        "jsb_status": 2,
16        "sdk_env": "external"
17      },
18  ∨    "device": {
19        "platform": "pc"
20      },
21      "index": 3,
22  ∨    "library": {
23        "name": "pixel.js",
24        "version": "2.2.0"
25      },
26  ∨    "page": {
27        "load_progress": "1",
28        "referrer": "https://www.peets.com/products/
             panama-don-bosco",
29        "url": "https://www.peets.com/products/
             panama-don-bosco"
30      },
31      "pageview_id":
           "pageId-1718227844076-4093147126345.3.0",
32  ∨    "pixel": {
33        "code": "CA6MK4JC77UC097ILEMG",
34        "codes": "CA6MK4JC77UC097ILEMG|
```

CLASS ACTION COMPLAINT

```
35        "runtime": "1"
36      },
37      "session_id":
        "d7f682ef-2902-11ef-8cbe-08c0eb4a4d36::qydUIpnpKI0
        WQkd7w7A8",
38 ⌄    "user": {
39        "anonymous_id": "f28niPH1oItk1Xz34TPIr7GW8Qa"
40      },
41      "userAgent": "Mozilla/5.0 (Macintosh; Intel Mac
        OS X 10_15_7) AppleWebKit/537.36 (KHTML, like
        Gecko) Chrome/125.0.0.0 Safari/537.36",
42      "variation_id": "test_2_single_track"
43    },
44    "event_id": "",
45    "is_onsite": false,
46    "message_id":
      "messageId-1718227844445-8521521334815",
47    "properties": {},
48 ⌄  "signal_diagnostic_labels": {
49 ⌄    "hashed_email": {
50        "label": "missing"
51      },
52 ⌄    "hashed_phone": {
53        "label": "missing"
54      },
55 ⌄    "raw_auto_email": {
56        "label": "missing"
57      },
58 ⌄    "raw_auto_phone": {
59        "label": "missing"
60      },
61 ⌄    "raw_email": {
62        "label": "missing"
63      },
64 ⌄    "raw_phone": {
65        "label": "missing"
66      }
67    },
68    "timestamp": "2024-06-12T21:30:44.445Z"
69  }
```

79.    The data includes the "session_id," which is a unique identifier generated by TikTok to track a user's activity. This allows TikTok to correlate the user's behavior from a browsing session, including page views and conversions, to a particular user or device to enhance advertising measurement, attribution, and targeting.[21]

---

[21] *See, e.g.*, How to get TikTok session id? (available at https://gbtimes.com/how-to-get-tiktok-session-id/).

CLASS ACTION COMPLAINT

80.    The data further includes extensive information about the content the user is viewing on the website. The "json_ld" parameter, in particular, describes nearly every aspect of the Peets product the user was viewing.

81.    Along with this data, the TikTok software code that Defendant causes to be stored on and executed by the user's device causes the "_ttp" cookie to be sent to TikTok's domain:

| POST | 200 | https://analytics.tiktok.com/api/v2, |
|------|-----|--------------------------------------|

| Request | Header | Query | Body | Cookies | Raw | Summary | + |
|---------|--------|-------|------|---------|-----|---------|---|

| Key | Value |
|-----|-------|
| _ttp | 2g7QSah5IOB8S0KS9Thb8IwIV9M |

82.    According to TikTok's documentation, the "_ttp" cookie is one of the company's advertising cookies, the purpose of which is "[t]o measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[22]

83.    Further, along with all of this data, the TikTok software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to TikTok:

| user-agent | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/ 125.0.0.0 Safari/537.36 |
|------------|---|

84.    As discussed above with respect to Facebook, the "user-agent" corresponds to the device and browser that the user has used to access the Website.

85.    Finally, the data sent to TikTok includes the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

86.    By collecting this user data, TikTok performs user behavior tracking, i.e., monitoring user actions like page views, clicks, and interactions to understand user engagement; advertising optimization, i.e., gathering data to enhance the relevance and effectiveness of

---

[22] See TikTok for Business: Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

CLASS ACTION COMPLAINT

TikTok advertising campaigns; and performance measurement (i.e., assessing the success of marketing efforts by analyzing user responses to ads and content).[23]

87.    Further, TikTok's Automatic Advanced Matching feature functions as follows: "When a visitor lands on your website and inputs customer information during registration, sign-in, contact, or checkout on a website where you installed your pixel, Automatic Advanced Matching will capture information from those fields. …TikTok will use hashed information to link event information to people on TikTok. TikTok may use matched events to better attribute events to TikTok ads, optimize advertisers' future campaigns, and depending on advertisers' and users' settings, TikTok may also add people to advertisers' retargeting or engagement audiences."[24]

### 5.    Microsoft Clarity Cookies

88.    Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users adjust settings in the Cookie preferences window to reject all non-strictly required cookies, to and from the **clarity.ms** domain. This domain is associated with Clarity, Microsoft's "cutting-edge behavioral analytics tool that helps you understand user interaction with your website or app".[25] Clarity is a Microsoft Advertising tool, which is described as "crucial for successful marketing."[26] "Clarity's tracking code … uses a cookie to obtain user session data." [27]

---

[23] *See* TikTok for Business: Using Cookies with TikTok Pixel
(available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).
[24] TikTok for Business: How to set up Automatic Advanced Matching (available at https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en).
[25] https://learn.microsoft.com/en-us/clarity/setup-and-installation/about-clarity.
[26] https://about.ads.microsoft.com/en/blog/post/october-2021/introducing-microsoft-clarity-insights-for-microsoft-advertising.
[27] https://learn.microsoft.com/en-us/clarity/setup-and-installation/cookie-consent.

CLASS ACTION COMPLAINT

89.     Clarity allows Defendant to "watch live users in action" via "recordings of live user interactions" on the website, including a user's "clicks or taps, scrolling, navigation, and more."[28] Indeed, Clarity boasts that it "tracks all visitor clicks and scrolls on mobile, desktop, and tablet[.]" These "session recordings" track each and every consumer's individual actions on the website.[29]



90.     Further, Clarity permits Defendant to aggregate individual users' session recordings into "heatmaps" for Defendant's financial gain. Heatmaps are "visualization tool[s]" aimed at "aggregat[ing] information about how users interact with the website." [30] This allows Defendant to "See at a glance which areas on [web site owner's] page drive the most engagement," a crucial element to increasing advertising revenue. [31] Clarity also permits Defendant to "track a specific subset of users," including tracking metrics like what browser users visited from, what type of device, the date, and more. Clarity even permits the use of specific "Clarity user ID[s]" which permits Clarity to track users across their devices, and identify when the same user visits multiple times to the website.[32] Businesses use Clarity to "make data-driven decisions" to "improve overall conversion rates" of clicks, engagement, or sales.[33] Microsoft notes in a Clarity case study that Clarity cookies permitted businesses to see a

---

[28] https://clarity.microsoft.com/session-recordings.
[29] *Id.*
[30] https://learn.microsoft.com/en-us/clarity/heatmaps/heatmaps-overview.
[31] https://clarity.microsoft.com/heatmaps.
[32] https://clarity.microsoft.com/insights; https://learn.microsoft.com/en-us/clarity/setup-and-installation/identify-api.
[33] https://clarity.microsoft.com/case-studies/ecommerce-boost/#:~:text=Using%20Clarity&text=By%20analyzing%20user%20sessions%20and,and%20improve%20overall%20conversion%20rates.

CLASS ACTION COMPLAINT

"substantial increase" in "purchases." [34] In one instance, "following just five days after implementing Clarity, the [business] saw an uplift of 19% in conversion rate."[35] Businesses consider Clarity a "must-have tool for any business serious about optimizing their website and increasing online revenue."[36]

91.    Microsoft collects data from Clarity,[37] which "Microsoft retains . . . for as long as necessary[.]"[38] Clarity cookies allow Microsoft to obtain and store at least the following user data: (i) user identifier; (ii) website interactions; (iii) interests and preferences; (iv) shopping behavior; (v) device information; (vi) demographic data; (vii) geolocation data; (viii) referring URL; and (ix) session information. [39]

92.    The type of cookie data sent to Clarity when a user visits the Website is as follows:

| POST | 204 No Content | https://y.clarity.ms/collect |
| --- | --- | --- |
| **Request** Header Query Body **Cookies** Raw \| Summary + | | |
| Key | Value | |
| MUID | 19CA2C801E7E691B14DE38F71FC4680C | |

93.    According to Microsoft documentation, the MUID cookie "[i]dentifies unique web browsers visiting Microsoft sites", and is "used for advertising, site analytics, and other operational purposes."[40]

### 6.    Additional Third-Party Cookies

94.    Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users rejected all non-strictly required cookies in the

---

[34] *Id.*
[35] *Id.*, emphasis in original.
[36] https://clarity.microsoft.com/case-studies/ecommerce-boost/#:~:text=Using%20Clarity&text=By%20analyzing%20user%20sessions%20and,and%20improve%20overall%20conversion%20rates.
[37] https://www.microsoft.com/en-us/privacy/privacystatement.
[38] *Id.*
[39] https://learn.microsoft.com/en-us/clarity/setup-and-installation/clarity-data.
[40] https://learn.microsoft.com/en-us/clarity/setup-and-installation/clarity-cookies.

cookie preferences window, to and from other domains, including (i) px.ads.linkedin.com; (ii) ct.pinterest.com; and (iii) analytics.twitter.com.

95.     The **linkedin.com** domain is owned by LinkedIn Corporation—a subsidiary of Microsoft Corp. LinkedIn Corporation runs the social media-based business networking platform LinkedIn. Cookies set by the linkedin.com domain are used to target website users with advertising and measure the performance of such ads.[41] These cookies assign a unique ID to users' devices, which allows LinkedIn to track users across the internet, and to collect information regarding IP address, operating system, browser information, web browsing activity—including the URL of both the site the users came from before accessing the website with the linkedin.com cookies and the one to which users navigate when they leave the website with the linkedIn.com cookies—download and purchase activity, and how users interact with ads.[42] Cookies set by the linkedIn.com domain are used to target users with advertisements on and off the LinkedIn social media platform.[43]

96.     The **pinterest.com** domain is associated with Pinterest, Inc., a popular social media platform that allows users to discover, save, and share ideas as pins in the form of photos and videos. Businesses can upload and showcase their products through "Shop the Look" pins or Product Pins that directly link to e-commerce websites. Businesses install the Pinterest tag on their websites to track ad conversions. As Pinterest explains, "The Pinterest tag is a piece of code that you add to your website. It lets Pinterest track visitors to your site, as well as the actions they take on your site after seeing your Pinterest ad. This means you can measure how effective your Pinterest ads are by understanding the actions people take on your website after seeing or engaging with your ad."[44] Pinterest cookies can be used to identify and track people who

---

[41] https://cookiepedia.co.uk/host/linkedin.com and https://www.linkedin.com/legal/cookie-policy.
[42] https://www.linkedin.com/legal/cookie-policy.
[43] *Id.*
[44] Pinterest Help Center: Install the Pinterest Tag (available at https://help.pinterest.com/en/business/article/install-the-pinterest-tag).

CLASS ACTION COMPLAINT

purchase products, add items to a shopping cart, visit specific pages on the website, and/or search for specific items on the website.[45]

97.    The **twitter.com** domain is associated with X Corp, formerly known as Twitter. X Corp's cookies collect a wide range of user data, including a user's browsing history; IP address; interactions with advertisements; data used to authenticate and secure personal accounts; and access to a device's local storage.[46] X Corp uses the collected user data to target users with personalized advertisements and content, generate analytics on website interaction, and to conduct unspecified "Research and Development."[47]

98.    These cookies allow these Third Parties to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, (v) interests and preferences, (vi) shopping behaviors, (vii) device information, (viii) referring URLs, (ix) session information, (x) user identifiers, and/or (xi) geolocation data—including whether a user is located in California.

**D.    The Private Communications Collected are Valuable.**

99.    As part of its regular course of business, Defendant targets California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendant's and the Third Parties' profit, all of the Private Communications transferred by the cookies which Defendant causes to be placed on Plaintiff's and other California Website users' devices without their knowledge or consent. Defendant knew the location of consumers like Plaintiff and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

100.    The Private Communications tracked and collected through cookies on the Website are valuable to Defendant and the Third Parties. Defendant uses this data to measure and optimize marketing campaigns, evaluate website design and product placement, and target

---

[45] *See, e.g.*, Pinterest Help Center: Add event codes (available at https://help.pinterest.com/en/business/article/add-event-codes); Pinterest Help Center: View tag parameters and cookies (available at https://help.pinterest.com/en/business/article/pinterest-tag-parameters-and-cookies).
[46] *See* https://help.x.com/en/rules-and-policies/x-cookies.
[47] *Id.*

specific users or groups of users with advertising. For example, Defendant can identify California users who visit webpages related to particular coffee or tea products and then target those users with advertisements for similar products both on the Website and across unrelated third-party websites.

101.    Data reflecting users' browsing activity allows Defendant to identify behavioral patterns, preferences, and interests relating to Defendant's products. At scale, this data enables Defendant to assess trends across its brands and within the broader consumer beverage market. Defendant monetizes this data by leveraging it to increase user engagement, advertising effectiveness, and overall revenue.

102.    The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[48] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

103.    Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

104.    By falsely representing consumers' ability to decline non-required cookies, and by aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to collect users' Private Communications, Defendant unjustly enriches itself at the expense of consumer privacy and autonomy. Defendant deprives consumers of the ability to decide whether, and on what terms, their data may be monetized.

---

[48] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

CLASS ACTION COMPLAINT

**PLAINTIFF'S EXPERIENCES**

105.    Plaintiff visited the Website to obtain information about Peet's offerings and locations, while located in California, on one or more occasions during the last four years, including in or around, August 2025.

106.    Plaintiff's visits to the Website were consistent with an ordinary Website user's visits seeking information about Defendant's products. Specifically, Plaintiff is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

107.    In particular, Plaintiff visited the Website because he sought to review Peet's menu to learn what food and beverages were available for purchase and to identify Peet's café locations near him. Plaintiff searched for and clicked links to view Peet's local menu offerings. To obtain that location-specific information, Plaintiff entered his zip code into a text field on the Website. Plaintiff's interactions generated and transmitted to the Third Parties a descriptive full-string URL (i.e., a URL in the following form that identified the products in which Plaintiff was interested, https://www.peets.com/products/cold-brew-protein-smoothie) and the zip code that he entered into the Website's text field.

108.    When Plaintiff visited the Website, it immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which provided the option to select the "Preferences" button. Plaintiff viewed Defendant's representation on the popup cookie consent banner that, "This website uses various technologies including cookies for personalization, website usage and performance measurement, and targeted advertising. Information about your site visit may be stored by or shared with third parties as identified in our Privacy Policy." Plaintiff also viewed Defendant's additional representation that, rather than choosing to "Accept" cookies for these and other purposes, users could instead adjust or manage cookie "Preferences."

109.    Consistent with his typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff selected and clicked the "Preferences" button, which caused Defendant's cookie preferences window to appear. There,

Plaintiff saw Defendant's representation that he could "Choose Type of Cookies You Accept Using[.]" Accordingly, Plaintiff adjusted the settings next to each category of Analytics and Statistics, Marketing and Retargeting, and Functionality cookies, unchecking or de-selecting all of them, except "Strictly Required" cookies, which had a setting he could not adjust. Plaintiff clicked the "Accept selected" button and proceeded to browse the Website.

110.   Plaintiff believed that adjusting settings associated with all categories of cookies, including all Analytics and Statistics, Marketing and Retargeting, and Functionality cookies, except "Strictly Required" cookies, using the options found in the Website's cookie preferences window would allow him to opt out of, decline, and/or reject all non-required cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks, analytics services, and/or other companies for the purposes of providing traffic analytics, targeted advertising, and personalized content).

111.   In adjusting settings in the cookie preferences window to decline or reject all categories of cookies, including all Analytics and Statistics, Marketing and Retargeting, and Functionality cookies, except "Strictly Required" cookies, Plaintiff gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff specifically rejected, based on Defendant's representations, those cookies used for "personalization, website usage and performance measurement, and targeted advertising" and that share information with third parties for these and other purposes. In reliance on these representations and promises, only then did Plaintiff continue browsing the Website.

112.   Even before either the popup cookie consent banner or cookie preferences window appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for traffic analytics, targeted advertising, and personalized content, to be placed on Plaintiff's device and/or transmitted to the Third Parties along with user data, without Plaintiff's knowledge. Accordingly, the Website's cookie preferences window representation to Plaintiff that he could "Choose Type of Cookies You Accept Using" while he browsed the Website was false. Contrary to what Defendant made Plaintiff believe, he did not

have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

113.    Then, as Plaintiff continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner and cookie preferences window, and despite Plaintiff's clear declination or rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing traffic analytics, targeted advertising, and personalized content from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff's Private Communications as Plaintiff browsed the Website.

114.    Defendant's representations that consumers could decline or reject cookies, except "Strictly Required" cookies, while Plaintiff and users browsed the Website, or at least those involved in providing traffic analytics, targeted advertising, and personalized content, were untrue. Had Plaintiff known this fact, he would not have used the Website. Moreover, Plaintiff reviewed the popup cookie consent banner and cookie preferences window prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to decline or reject all non-strictly required cookies, Plaintiff would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Website differently.

115.    Plaintiff continues to desire to browse content featured on the Website. Plaintiff would like to browse websites that do not misrepresent that users can decline or reject all non-required cookies and tracking technologies. If the Website were programmed to honor users' requests to decline or reject all non-required cookies and tracking technologies, Plaintiff would likely browse the Website again in the future, but will not do so until then. Plaintiff regularly visits websites that feature content similar to that of the Website. Because Plaintiff does not know how the Website is programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Website honors users' requests to decline or reject all non-required cookies and tracking technologies, Plaintiff will be unable to rely on

Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff is not a software developer and has not received training with respect to HTTP network calls.

## CLASS ALLEGATIONS

116.    Plaintiff brings this Class Action Complaint on behalf of himself and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiff seeks to represent the following group of similarly situated persons, defined as follows:

> **Class**: All persons who browsed the Website in the United States adjusting settings in the cookie preferences window to decline or reject all non-strictly required cookies, including all Analytics and Statistics, Marketing and Retargeting, and Functionality cookies.

117.    This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

118.    **Numerosity:** Plaintiff does not know the exact size of the Class, but he estimates that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

119.    **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful conduct that led them to believe that Defendant would not cause third-party cookies to be placed on their browsers and devices and/or transmitted to third parties along with user data, after Class members chose to decline or reject all non-required cookies and tracking technologies on the

Website, nor would Defendant permit third parties to track and collect Class members' Private Communications as Class members browsed the Website.

120.    The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a.    Whether Defendant's actions violate California laws invoked herein; and

b.    Whether Plaintiff and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

121.    **Typicality:** Plaintiff's claims are typical of the claims of the other members of the Class because, among other things, Plaintiff, like the other Class members, visited the Website, declined or rejected all non-required cookies, and had his confidential Private Communications intercepted by the Third Parties.

122.    **Adequacy of Representation:** Plaintiff will fairly and adequately protect the interests of all Class members because it is in his best interests to prosecute the claims alleged herein to obtain full compensation due to him for the unfair and illegal conduct of which he complains. Plaintiff also has no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiff has retained highly competent and experienced class action attorneys to represent his interests and those of the Class. By prevailing on his claims, Plaintiff will establish Defendant's liability to all Class members. Plaintiff and his counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

123.    **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly

- 47 -

situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action: Invasion of Privacy

124.    Plaintiff realleges and incorporates the paragraphs of this Complaint as if set forth herein.

125.    To plead an invasion of privacy claim, Plaintiff must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiff had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

126.    Defendant has intruded upon the following legally protected privacy interests of Plaintiff and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiff's and Class members' Fourth Amendment right to privacy.

127.    Plaintiff and Class members had a reasonable expectation of privacy under the circumstances, as Defendant affirmatively promised users they could "Choose Type of Cookies You Accept Using" before proceeding to browse the Website. Plaintiff and other Class members directed their electronic devices to access the Website and, when presented with the popup cookies consent banner and cookie preferences window on the Website, Plaintiff and Class members declined or rejected all non-strictly required cookies, and reasonably expected that his and their declination or rejection of all such cookies and tracking technologies would be honored.

That is, he and they reasonably believed that Defendant would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Website. Plaintiff and Class members also reasonably expected that, if they declined or rejected all such cookies and/or tracking technologies, Defendant would not permit the Third Parties to track and collect Plaintiff's and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Website.

128.     Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

129.     Defendant, in violation of Plaintiff's and other Class members' reasonable expectation of privacy and without their consent, permits the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California. The data that Defendant allowed third parties to collect enables the Third Parties to (and they in fact do), *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiff's and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

130.    Defendant's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

131.    Defendant's intrusion into Plaintiff's privacy was also highly offensive to a reasonable person.

132.    Defendant lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

133.    Plaintiff and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

134.    Plaintiff and Class members seeks appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiff's and Class members' privacy.

135.    Plaintiff and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiff and Class members and made in conscious disregard of Plaintiff's and Class members' rights and Plaintiff's and Class members' declination or rejection of the Website's use of non-required cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

## <u>Second Cause of Action</u>: Intrusion Upon Seclusion

136.    Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

137.    To assert a claim for intrusion upon seclusion, Plaintiff must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiff had a

reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

138.    By permitting third-party cookies to be stored on consumers' devices without consent, which caused the Third Parties to track and collect Plaintiff's and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendant's representations otherwise in the popup cookie consent banner, Defendant intentionally intruded upon the solitude or seclusion of Website users. Defendant effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

139.    The Third Parties' tracking and collecting of Plaintiff's and Class member's Private Communications on the Website using third-party cookies that Defendant caused to be stored on users' devices—and to be transmitted to Third Parties—was not authorized by Plaintiff and Class members, and, in fact, those Website users specifically chose to decline or reject all non-strictly required cookies.

140.    Plaintiff and the Class members had an objectively reasonable expectation of privacy surrounding his and their Private Communications on the Website based on Defendant's promise that users could "Choose Type of Cookies You Accept Using", as well as state criminal and civil laws designed to protect individual privacy.

141.    Defendant's intentional intrusion into Plaintiff's and other users' Private Communications would be highly offensive to a reasonable person given that Defendant represented that Website users could adjust settings in the cookie preferences window to decline or reject all categories of cookies, including all Analytics and Statistics, Marketing and Retargeting, and Functionality cookies, except "Strictly Required" cookies, when, in fact, Defendant caused such third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers declined or rejected all such cookies. Indeed, Plaintiff and Class members reasonably expected, based on Defendant's false

representations, that when he and they declined or rejected all non-required cookies and tracking technologies, Defendant would not cause such third-party cookies to be stored on his and their devices or permit the Third Parties to obtain their Private Communications on the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

142.    Defendant's conduct was intentional and intruded on Plaintiff's and users' Private Communications on the Website.

143.    Plaintiff and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

144.    Plaintiff and Class members seeks appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiff's and Class members' privacy.

145.    Plaintiff and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiff and Class members and made in conscious disregard of Plaintiff's and Class members' rights and Plaintiff's and Class members' declination or rejection of the Website's use of non-required cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)**

146.    Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

147.    California Penal Code § 631(a) provides, in pertinent part:

"Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so

obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

148.    The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

149.    Further, as the California Supreme Court has held, in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*

> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360–61 (emphasis supplied; internal citations omitted).

150.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192–93 (1978). Thus, to establish liability under § 631(a), Plaintiff need only establish that Defendant, "by means of any machine, instrument, contrivance, or in any other manner," did ***any*** of the following:

> [i] Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;

> [ii] Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;

> [iii] Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained

Cal. Penal Code § 631(a).

CLASS ACTION COMPLAINT

151.    CIPA § 631(a) also penalizes those who [iv] "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

152.    Defendant is a "person" within the meaning of California Penal Code § 631.

153.    Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

154.    The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties— constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

155.    Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiff and Class members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

156.    Under § 631(a), Defendant must show it had the consent of all parties to a communication.

157.    At all relevant times, the Website caused Plaintiff and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiff's and Class members' consent. By configuring the Website in this manner, Defendant willfully aided, agreed with, employed, permitted, or otherwise caused the Third Parties to wiretap Plaintiff and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

158.    At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and Class members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

159.    The Private Communications of Plaintiff and Class members, on the one hand, and Defendant, on the other, that the Third Parties automatically intercepted directly communicates the Website user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

160.    At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

161.    Plaintiff and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of

Plaintiff's and Class members' electronic communications. Nor did Plaintiff and Class members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiff and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiff's and Class members' electronic communications by choosing to adjust settings in the cookie preferences window to decline or reject all categories of cookies, including all Analytics and Statistics, Marketing and Retargeting, and Functionality cookies, except "Strictly Required" cookies.

162. The wiretapping of Plaintiff and Class members occurred in California, where Plaintiff and Class members accessed the Website and where the Third Parties—as caused by Defendant—routed Plaintiff's and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiff's California-located device. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

163. Plaintiff and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of his and their right to privacy, (ii) loss of value in his and their Private Communications, (iii) damage to and loss of Plaintiff's and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

164. Pursuant to California Penal Code § 637.2, Plaintiff and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendant's violations of CIPA § 631(a), as well as injunctive relief.

165. Unless enjoined, Defendant will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record,

collect, and use Plaintiff's and Class members' electronic Private Communications with Defendant. Plaintiff, Class members, and the general public continue to be at risk because Plaintiff, Class members, and the general public frequently use the internet to search for information and content related to coffee and tea products. Plaintiff, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiff, Class members, and the general public have no practical way to know if his and their request to decline or reject non-required cookies and tracking technologies will be honored and/or whether Defendant will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiff's and Class members' electronic Private Communications with Defendant. Further, Defendant has already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiff's and Class members' electronic Private Communications with Defendant and will continue to do so unless and until enjoined.

### Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51)

166.    Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

167.    The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

168.    California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

169.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

170. The Third Parties' cookies and the corresponding software code installed by Defendant on its Website are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiff's and the Class's computers or devices. Cal. Penal Code § 638.50(b).

171. At all relevant times, Defendant caused the Third Parties' cookies and the corresponding software code—which are pen registers—to be placed on Plaintiff's and Class members' browsers and devices, and/or to be used to transmit Plaintiff's and Class members' IP address and user-agent information. *See Greenley v. Kochava,* 2023 WL 4833466, at *15–16 (S.D. Cal. July 27, 2023); *Shah v. Fandom, Inc.*, 2024 U.S. Dist. LEXIS 193032, at *5–11 (N.D. Cal. Oct. 21, 2024).

172. Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiff's and the Class members' electronic communications with the Website. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014). ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

173. Plaintiff and Class members did not provide their prior consent to Defendant's use of third-party cookies and the corresponding software. On the contrary, Plaintiff and the Class members informed Defendant that they did not consent to the Website's use of third-party cookies by adjusting settings in the cookie preferences window to decline or reject all categories of cookies, including all Analytics and Statistics, Marketing and Retargeting, and Functionality cookies, except "Strictly Required" cookies.

174. Defendant did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiff's and Class member's IP addresses and user-agent information.

175. As a direct and proximate result of Defendant's conduct, Plaintiff and Class members suffered losses and were damaged in an amount to be determined at trial.

176.    Pursuant to Penal Code § 637.2(a)(1), Plaintiff and Class members are also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

**Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation**

177.    Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

178.    Defendant fraudulently and deceptively informed Plaintiff and Class members that he and they could "Choose Type of Cookies You Accept Using" by adjusting the available settings in the cookie preferences window to decline or reject all categories of cookies, including all Analytics and Statistics, Marketing and Retargeting, and Functionality cookies, except "Strictly Required" cookies.

179.    However, despite Defendant's representations otherwise, Defendant caused third-party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users adjusted settings in the cookie preferences window to decline or reject all categories of cookies, including all Analytics and Statistics, Marketing and Retargeting, and Functionality cookies, except "Strictly Required" cookies. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiff's and Class members' Private Communications, even when consumers had previously chosen to decline or reject all such cookies.

180.    These misrepresentations and omissions were known exclusively to, and actively concealed by Defendant, not reasonably known to Plaintiff and Class members, and material at the time they were made. Defendant knew, or should have known, how the Website functioned, including the Third Party's resources it installed on the Website and the third-party cookies in use on the Website, through testing the Website, evaluating its performance metrics by means of its accounts with the Third Parties, or otherwise, and knew, or should have known, that the Website's programming allowed the third-party cookies to be placed on users'—including Plaintiff's—browsers and devices and/or transmitted to the Third Parties along with users' Private Communications even after users attempted to decline or reject all non-strictly required cookies, which Defendant promised its users they could do. Defendant's misrepresentations and

omissions concerned material facts that were essential to the analysis undertaken by Plaintiff and Class members as to whether to use the Website. In misleading Plaintiff and Class members and not so informing him and them, Defendant breached its duty to Plaintiff and Class members. Defendant also gained financially from, and as a result of, its breach.

181. Plaintiff and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions.

182. Plaintiff and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendant's unfair, deceptive, and/or unlawful practices, including the unauthorized interception of his and their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiff and Class members have also suffered harm in the form of diminution of the value of his and their private and personally identifiable information and communications.

183. Defendant's actions caused damage to and loss of Plaintiff's and Class members' property right to control the dissemination and use of their personal information and communications.

184. Defendant's representation that consumers could decline or reject all cookies, including all Analytics and Statistics, Marketing and Retargeting, and Functionality cookies, except "Strictly Required" cookies (including those cookies used for "personalization, website usage and performance measurement, and targeted advertising") if they adjusted the settings in the cookie preferences window was untrue. Again, had Plaintiff and Class members known these facts, they would not have used the Website. Moreover, Plaintiff and Class members reviewed the popup cookie consent banner and cookie preferences window prior to their interactions with the Website. Had Defendant disclosed that it caused third-party non-required cookies to be stored on Website visitors' devices that are related to traffic analytics, targeted advertising, and personalized content, and/or share information with third parties even after they choose to

decline or reject all such non-required cookies, Plaintiff and Class members would have noticed it and would not have interacted with the Website.

185.    By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiff and Class members to alter their positions to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiff and Class members to, without limitation, use the Website under the mistaken belief that Defendant would not permit third parties to obtain users' Private Communications when consumers chose to decline or reject non-required cookies. As a result, Plaintiff and the Class provided more personal data than they would have otherwise.

186.    Plaintiff and Class members justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant's conduct.

187.    As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiff and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

188.    Plaintiff and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiff and Class members and made in conscious disregard of Plaintiff's and Class members' rights and Plaintiff's and Class members' declination or rejection of the Website's use of non-required cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Sixth Cause of Action: Unjust Enrichment**

189.    Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

190.    Defendant created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

191.    Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could decline or reject all categories of cookies, including all Analytics and Statistics, Marketing and Retargeting, and Functionality cookies, except "Strictly Required" cookies and by permitting the Third Parties to store and transmit cookies on Plaintiff's and Class members' devices and browsers, which permitted the Third

Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members declined or rejected all such cookies.

192.    Plaintiff and Class members' Private Communications have conferred an economic benefit on Defendant.

193.    Defendant has been unjustly enriched at the expense of Plaintiff and Class members, and Defendant has unjustly retained the benefits of its unlawful and wrongful conduct.

194.    Defendant appreciated, recognized, and chose to accept the monetary benefits that Plaintiff and Class members conferred onto Defendant at his and their detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of Plaintiff and Class members.

195.    It would be unjust for Defendant to retain the value of Plaintiff's and Class members' property and any profits earned thereon.

196.    There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

197.    Plaintiff and Class members are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiff and Class members to the position he and they occupied prior to having his and their Private Communications tracked and collected by the Third Parties.

198.    Plaintiff pleads this claim separately, as well as in the alternative, to his other claims, as without such claims Plaintiff would have no adequate legal remedy.

## PRAYER FOR RELIEF

**WHEREFORE**, reserving all rights, Plaintiff, on behalf of himself and the Class members, respectfully requests judgment against Defendant as follows:

CLASS ACTION COMPLAINT

A.  Certification of the proposed Class, including appointment of Plaintiff's counsel as class counsel;

B.  An award of compensatory damages, including statutory damages where available, to Plaintiff and Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, including both pre- and post-judgment interest thereon;

C.  An award of punitive damages;

D.  An award of nominal damages;

E.  An order for full restitution;

F.  An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

G.  An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H.  For reasonable attorneys' fees and the costs of suit incurred; and

I.  For such further relief as may be just and proper.

Dated: January 16, 2026

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier*
Seth A. Safier (State Bar No. 197427)
 seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
 marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
 todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiff*